**Lawrence D. BAKER, Petitioner,**

v.

**DEFENSE LOGISTICS AGENCY, Respondent.**

**Appeal No. 85–2040.**

United States Court of Appeals, Federal Circuit.

Feb. 5, 1986.

Francisco A. Garabis, Columbus, Ohio, argued, for petitioner.

Ralph A. Mittelberger, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for respondent. With him on brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Robert A. Reutershan, Asst. Director and Carol N. Park. H. Lowell Ralph, Associate Gen. Counsel, Defense Logistics Agency, Defense Const. Supply Center, Columbus, Ohio, of counsel.

Before FRIEDMAN and DAVIS, Circuit Judges, and MILLER, Senior Circuit Judge.

JACK R. MILLER, Senior Circuit Judge.

Petitioner timely appealed to the Chicago Regional Office of the Merit Systems Protection Board ("MSPB") from the action taken by the Defense Logistics Agency, Defense Construction Supply Center, Columbus, Ohio, demoting him, effective February 12, 1984, from the position of Equipment Mechanic Foreman of the Operations Production Control/Maintenance Division of the agency's Directorate of Maintenance to the position of Electrical Equipment Repairer Foreman in the Industrial Equipment Maintenance Branch of the Equipment and Maintenance Division of the agency's Directorate of Installation Services. Petitioner was demoted for his alleged failure to perform two of the five critical elements [1] of his position at an acceptable level of competence under the agency's employee performance appraisal system.[2]

The Presiding Official ("PO") reversed the agency action, finding that it failed to prove by substantial evidence that petition-

---

1. The two critical elements required, respectively, petitioner (1) to plan, assign, schedule, and manage the work to be accomplished within the organization, and (2) to ensure that the work of the unit meets quantity and quality requirements. A "critical element" is a component of an employee's job that is of sufficient importance that performance below the minimum standard established by management would result in "unacceptable" performance of assigned work. *See* 5 C.F.R. §§ 430.203, 430.204(d) (1984).

2. The record shows that the Office of Personnel Management approved the agency's performance appraisal system on June 18, 1981; that petitioner received a copy of the agency's individual performance appraisal plan for the position of Equipment Mechanic Foreman on August 28, 1981; and that it was used to evaluate his performance.

er did not meet the performance standards for the minimally acceptable level of performance of the two critical elements, and ordered the agency to cancel its action demoting petitioner. The MSPB reversed the initial decision of the PO and sustained the agency action, finding that the agency did prove by substantial evidence that petitioner failed to acceptably perform the critical elements. 25 M.S.P.R. 614 (1985). We affirm.[3]

### Presiding Official's Opinion

With respect to the first critical element, the PO stated that the agency had alleged that petitioner's performance was unacceptable because (1) petitioner was not familiar with his unit's program and the required results; (2) nearly 18% of his completed machine repair projects exceeded 10% of the actual manhours/materials estimates required for completion of repairs; (3) only 80% of his repair estimates were submitted within the established time frames; and (4) most of those estimates resulted in excessive expenditures by petitioner's unit. The PO further stated that the agency had alleged that petitioner's immediate supervisor (Chief of the Operations Production Control/Maintenance Division) met with petitioner and the other branch foreman and outlined specific actions he required of them as branch foremen, namely: (1) maintain full knowledge of their shop work load, including completion dates; (2) assure that all of their employees were productive and that they were aware of work requirements and comple-

tion dates; (3) take immediate steps to avoid work delays; and (4) plan and organize their shop work to enhance continuous and even workflow.[4]

The PO found that to achieve the minimally acceptable level of performance for the first critical element, petitioner had to meet, *inter alia*, the following performance standards:

b. (He is) normally familiar with most of the ongoing work of the organization;
c. (His) competent technical advice normally can be provided to subordinates as necessary to achieve an effective work product; and, d. (He) in most cases assures that work is completed on time, according to the work plan of the unit.

With respect to familiarity with most of the ongoing work of the organization, the PO related that petitioner's supervisor testified that on *several occasions* he asked petitioner for status reports and that petitioner told him he was unable to provide an on-the-spot status report for some of the work in his unit; however, petitioner established that he was familiar with *most* of the ongoing work of his unit. The PO found that, because the performance standard was phrased in terms of "normally familiar" with "most" of the ongoing work, the agency did not establish by substantial evidence that petitioner failed to meet this standard. Regarding the standard that his competent technical advice *normally* can be provided to subordinates, the PO found this standard conclusory in nature and factually unsupported. As to the standard that in

---

**3.** Petitioner raises the jurisdictional issue that the agency's petition to the MSPB was untimely. The petition was not received until August 6, 1984, more than 35 days after the initial decision. However, we note that the petition was postmarked August 2, 1984, within 35 days of the initial decision dated June 29, 1984, as provided by 5 C.F.R. § 1201.114(b). The MSPB has pointed out that it considers the postmark date to be the filing date (citing cases) and that this interpretation is consistent with 5 C.F.R. § 1201.22(b), which provides that the date of filing petitions for appeal and responses thereto shall be determined by the date of mailing indicated by the postmark date. We are satisfied that the MSPB's interpretation of its own regulation is reasonable. *Huey v. Department of*

*Health and Human Servs.*, 782 F.2d 1575, 1578 (Fed.Cir. 1986).

**4.** It should be noted that petitioner's position description states that he, as foreman of one of the three repair branches within the Maintenance Division, directed some fifteen nonsupervisory Equipment Repairers engaged in repairing, reconditioning, and rebuilding industrial plant equipment and machine tools. The position description also states that petitioner's performance would be evaluated in terms of timeliness of the work unit, compliance with instructions, economy and efficiency of operations, and overall mission accomplishment.

*most* cases assures that work is completed on time, the PO observed that the record discloses that petitioner's unit completed repairs on or rebuilt 97 machines from August 1, 1982, through July 31, 1983; that of these 97 machines, 51 were completed on time and 46 were late; that of the 46, six were late for reasons beyond petitioner's control; that, even assuming that 40 of the 97 machines were late for reasons within petitioner's control, the standard is stated in terms of "most cases"; and that the common meaning of the word "most" (citing *American Heritage Dictionary*) is "the greatest number" or "the majority."

As to the second critical element, the PO stated that the agency alleged that petitioner failed to meet the minimally acceptable standard because (1) petitioner's unit completed work on 97 machines during the period August 1, 1982, through July 31, 1983; (2) of that total, work on 46 machines exceeded the required completion dates—an on-time effectiveness of 53%; and (3) petitioner failed to meet his own work load projections by more than 50% for the month of July, 1983. The PO related that the agency relied on the statement of petitioner's supervisor that he had emphasized to petitioner the importance of completing two of the late machines in time to contact the customers to witness the final test and inspection; that these two machines were not completed on schedule and one of them was reassigned to another repair unit because of unsatisfactory progress in petitioner's unit; and that during the August 1, 1982—July 31, 1983 period, 17% of the completed machines were rejected during final tests due to petitioner's failure to assure that the work met the required quality.

The PO found that to achieve the minimally acceptable level of performance for the second critical element, the standard states that "the work unit usually meets deadlines, and quality of work is usually acceptable"; that the word "usual," from which "usually" is derived, means (citing *Random House College Dictionary*) occurs more often than not; and that petitioner met his deadlines "more often than not" (51 times out of 97) and that the quality of the work he produced was acceptable "more often than not" (83% of the time).

## MSPB Opinion

Quoting 5 U.S.C. § 4302(b)(1),[5] the board stated that Congress recognized that the statute would benefit employees by protecting them from arbitrary labeling of their work as "unacceptable" and would ensure that employees were made aware in advance of what was expected of their performance; further, that Congress intended the agency to have considerable flexibility in devising methods for evaluating performance and, therefore, limited the board's scope of review to determining whether the agency abused its discretion in promulgating performance standards. The board found that the agency had not abused its discretion in establishing petitioner's performance standards. It remarked that, although these standards do not establish specific time targets or numeric measures, the statute requires only that the agency use objective criteria "to the maximum extent feasible," at 616; *Adkins v. Department of Housing & Urban Development*, 781 F.2d 891, 896 (Fed.Cir. 1986), and that the agency could reasonably determine that petitioner's performance in a supervisory position could not be measured by a "mechanical, judgment-free rating." Therefore, it found merit in the agency's argument that the PO, in interpreting the performance standards, should have considered, in addition to the language used in the standards, the evidence presented by the agency (written instructions, evidence that the employee was informed specifically of deficiencies in his

5. "Under regulations which the Office of Personnel Management shall prescribe, each performance appraisal system shall provide for ... establishing performance standards which will, to the maximum extent feasible, permit the accurate evaluation of job performance on the basis of objective criteria ... related to the job in question for each employee or position under the system." 5 U.S.C. § 4302(b)(1) (1982).

work and how he could improve his performance, memoranda describing to the employee what constitutes unacceptable performance, and agency responses to the employee's questions concerning his performance).

As to the first performance standard of the first critical element, requiring petitioner to be normally familiar with most of the ongoing work of his unit, the board disagreed with the PO's conclusion that the agency did not establish by substantial evidence that petitioner failed to meet the standard. The PO relied upon what it termed "credible testimony" of petitioner's subordinates and other employees that he was aware of work that was going on in his unit. However, the board observed that petitioner's supervisor testified that on several occasions petitioner was unable to give him requested status reports and that petitioner did not dispute this. The board did not dispute the credibility of petitioner's subordinates and other employees, but criticised the PO for not giving "more weight" to the testimony of the supervisor, who could better determine whether petitioner met the standard. Also, the board referred to evidence in the record showing that petitioner had been informed by the agency that he was expected to maintain full knowledge of his unit's work load and that he was failing to meet this standard. Accordingly, the board concluded that there was substantial evidence to support the agency's position.

Regarding the second performance standard (competent technical advice normally can be provided subordinates as necessary to achieve an effective work product), the board said that the PO found that petitioner's subordinates "testified persuasively that [petitioner] met the standard and [his] supervisor's testimony to the contrary was not persuasive because it was not based on personal knowledge." However, the board found that the supervisor *was* in a position to know whether petitioner was giving competent advice to his subordinates. It noted, *inter alia,* that in a letter of caution, the supervisor had informed petitioner that he must influence quality, efficiency, and

economy among his employees and offered to assist petitioner to improve his supervisory proficiency; that in a subsequent letter of caution the supervisor advised petitioner of his duty to direct his subordinates; that in a subsequent letter of warning of unacceptable performance the supervisor, referring to petitioner's overall record, told petitioner that he was expected to ensure that his subordinates were provided with necessary supervision, instruction, and guidance to accomplish their duties; and that in yet another letter of unacceptable performance the agency stated that petitioner had not exercised good supervisory efforts or given clear instructions to his subordinates. Therefore, the board concluded that substantial evidence supported the agency's charge that petitioner failed to meet this performance standard.

With respect to the third performance standard, the board found that the PO erred in finding that petitioner met this standard because only 46 out of 97 of his unit's machines were late (and six of these were late for reasons beyond his control). It pointed out, *inter alia,* that the first letter of caution informed petitioner that he was expected to take immediate action to alleviate any delays or expected delays and to develop and implement a plan for processing new maintenance inputs and late machines on time, warning that "future delays might result in disciplinary action"; that the second letter of caution stated that petitioner's performance continued to be unacceptable. The board found that the agency had presented substantial evidence that petitioner failed to meet this performance standard.

In view of the above, the board concluded that "the agency proved by substantial evidence that [petitioner] failed to perform acceptably" on the first critical element of his position.

Regarding the second critical element, the board stated that this had only one performance standard, namely: that the work unit usually meets deadlines and

quality of work is usually acceptable. It rejected the PO's finding that petitioner satisfied this standard because he met his deadlines and his work was acceptable "more often than not," pointing out that the "agency file is replete with quality deficiency records documenting deficiencies in [petitioner's] unit's work products." Therefore, it concluded that petitioner's failure to perform acceptably this critical element of his position is supported by substantial evidence.

We agree with the board's decision for the reasons set forth in its opinion. *See Lisiecki v. Merit Systems Protection Board,* 769 F.2d 1558 (Fed.Cir.1985). The board's rejection of the PO's rigid, statistical quantification of the terms "usually" and "most" in the agency's performance standards furthers the policy of the statute (5 U.S.C. § 4302(b)(1)) that performance standards will, "to the maximum extent feasible," be based on objective criteria. These would include information set forth in the supervisor's written instructions, letters, and memoranda to petitioner. Indeed, we are persuaded that the PO's rigid quantification approach, without more, could open the door to retention of employees who do not meet a minimally acceptable level of performance.[6]

The decision of the board is *affirmed.*

AFFIRMED.

---

**6.** Although "most" of the machines repaired or rebuilt by petitioner's unit from August 1, 1982, through July 31, 1983, were completed on time (51 of 97), there is no breakdown showing the comparative degree of work to be done on each machine. Conceivably, quantification of the maintenance performed on the 40 machines (46 minus 6 late for reasons allegedly beyond petitioner's control) could have shown a heavier impact on the unit's performance than that of the 51 "on time" machines.